# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

| | | |
|---|---|---|
| **RUSSELL BUCKLEW,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 14-2163** |
| **v.** | ) | <span style="color:red">**Capital Case**</span> |
| | ) | <span style="color:red">**Scheduled for Execution**</span> |
| **GEORGE LOMBARDI, et al.,** | ) | <span style="color:red">**May 21, 2014**</span> |
| **Defendants.** | ) | |

## MOTION FOR STAY OF EXECUTION

Plaintiff Russell Bucklew, by and through his counsel, hereby moves this Honorable Court for a stay of execution while this Court hears his appeal from the Order of the United States District Court on May 19, 2014, dismissing his claims in a lawsuit under 42 U.S.C. §1983 and the Eighth and Fourteenth Amendments that challenges Missouri's lethal injection protocol *as applied* to Mr. Bucklew. Mr. Bucklew's lawsuit is based on the *unique* risks to him arising from the unstable and untreatable vascular tumors that fill his head, neck and throat. (*See* Exh. A, Doc. 17). Because of these *unique* risks – which create a substantial likelihood of hemorrhaging, choking, airway obstruction and suffocation – lethal injection with *any* drug will likely violate Mr. Bucklew's rights under the Eighth Amendment. Mr. Bucklew is afflicted with an untreatable condition – deemed inoperable and not responsive to standard medical therapies like sclerotherapy –

and his condition is only expected to grow worse over time.  Given the *nature* of the affliction and its *untreatable* nature, Mr. Bucklew cannot propose an alternative, constitutional method of execution, particularly within the limitations of Mo. Rev. Stat. 546.720, which provides only for the administration of lethal injection or lethal gas.  *Lethal injection is not a one-size-fits-all procedure.*  What may be deemed constitutional for one prisoner may be gravely risky and likely torturous for the next.  Moreover, to *allege* such alternative means, any prisoner would require the ability to obtain facts from the State of Missouri which the State has continued to hide and conceal on the ground they are "state secrets."  Lastly, the requirement of offering an alternative, constitutional means to kill one's own client violates any lawyer's ethical obligations to his client and places any lawyer in an incurable conflict of interest.

## I.    Introduction

Mr. Bucklew, scheduled to be executed on May 21, 2014, at 12:01 a.m., seeks both emergency and permanent relief, requesting that this Court declare and enforce his rights under Eight and Fourteenth Amendments by commanding Defendants not to carry out any lethal injection on Mr. Bucklew because Missouri's execution protocol and procedures will almost inevitably lead to a bloody, prolonged and excruciating execution because of specific risks posed to Mr. Bucklew.

These risks are not remote and speculative, but rather immediate and grave. *Lethal injection is not a one-size-fits-all procedure.* The clumps of weak, malformed vessels that fill Mr. Bucklew's face, head and throat could easily rupture during the execution – potentially causing him to cough and choke on his own blood. His vascular abnormalities could also impair the circulation of the lethal drug – leading to a prolonged and excruciating execution. Most disturbingly, Mr. Bucklew's airway is partly obstructed, and any secretion seeping into it or any further swelling of his hemangiomas could cause him to struggle for air, which would lead to a vicious cycle in which struggling for air causes further difficulty breathing, leading ultimately to Mr. Bucklew suffocating to death.

Mr. Bucklew has suffered from symptoms of his dangerous and sometimes debilitating congenital condition – cavernous hemangioma – throughout his adulthood, and his vascular malformations have grown steadily worse. He suffers from nearly constant pain and pressure in his face and regularly bleeds from his facial orifices. Mr. Bucklew also must sleep with his head propped up because of his airway obstruction. Despite these urgent medical issues, Mr. Bucklew has not had a CT scan or MRI in four years.

Executing Mr. Bucklew in a manner that would cause him to hemorrhage, choke on his own blood, suffocate or suffer through a protracted and excruciating execution would violate the Eighth Amendment's prohibition on Cruel and

Unusual Punishment.  The likelihood of these scenarios is substantial.  Dr. Joel Zivot, a board-certified anesthesiologist who teaches at the Emory University School of Medicine, concluded after reviewing Mr. Bucklew's medical records that a substantial risk existed that, because of Mr. Bucklew's vascular malformation, the lethal drug will likely not circulate as intended, creating a substantial risk of a "prolonged and extremely painful execution."  (Exh. B at ¶18).  Dr. Zivot also concluded that a very substantial risk existed that Mr. Bucklew would hemorrhage during the execution, potentially choking on his own blood – a risk greatly heightened by Mr. Bucklew's partially obstructed airway.  (Exh. B at ¶15).  "If blood enters Mr. Bucklew's airway, it would likely cause choking and coughing, which Mr. Bucklew will experience as severe pain and suffocation."  (Exh. B at ¶18).

The risks involved in executing Mr. Bucklew are readily apparent from the Department of Corrections' *own medical records*, which describe the hemangiomas as "very massive" and "extensive."  (Exh. E).  The last MRI, from June 2010, notes that Mr. Bucklew's airway is "severely compromised."  (Exh. E at 1295).

Despite knowledge of Mr. Bucklew's condition, the Department of Corrections has failed to prepare for his execution.  It has neither obtained any imaging studies, nor had anyone examine Mr. Bucklew's compromised airway.

No one has taken any steps to prepare for the likelihood of hemorrhaging or choking. Although Defendants belatedly acknowledge that "Russell Bucklew appears to have serious medical issues," they offer no reasonable plan to execute him consistent with the demands of the United States Constitution.

The Department of Corrections, in response to Mr. Bucklew's motion for stay of execution, has offered no evidence of its own. Mr. Bucklew's evidence therefore stands uncontroverted. Although the district court indicated it was accepting as true all information contained in Plaintiff's affidavits, it repeatedly discounted the representations of Plaintiff's experts. (Exh. A at 6 n.1)

Mr. Bucklew's counsel faced very substantial obstacles in their effort to obtain the expert evidence. Although counsel repeatedly requested funding for experts in state and federal court – a total of *eight times* between 2008 and 2014, even up through one week ago – they were repeatedly denied, often with no explanation. Mr. Bucklew's counsel – who have not been paid since February 2012 and will not likely receive any fees for this litigation or much of their clemency representation – have themselves paid for all expenses, including obtaining necessary medical records and travel costs for Dr. Zivot. Despite obstacles, counsel diligently and timely pursued Mr. Bucklew's claims, finally locating experts who were willing to undertake a review of Mr. Bucklew's case on the mere hope they would be paid at some point. Those experts have provided

opinions that establish that Mr. Bucklew is at a very substantial risk of suffering severe, even excruciating pain during the execution. *Baze v. Rees*, 550 U.S. 35, 50 (2008); *Brewer v. Landrigan*, 131 S. Ct. 445 (2010). These risks are likely to attend any proposed method of execution for Mr. Bucklew that involves lethal injection.

Based just on the evidence, it is clear that Mr. Bucklew is entitled to a stay of execution under *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Given the gravity of his condition, there is a very substantial likelihood he will succeed on the merits of his claims, and the relative harm to him is great, as compared with the minimal harm to the State from staying the execution while both sides have an opportunity to develop a full factual record. Moreover, Mr. Bucklew's counsel have acted diligently in attempting to bring his claims – repeatedly requesting funds from federal and state courts for the purpose of retaining experts to examine Mr. Bucklew's records and render an opinion. Those requests, though modest, have been repeatedly rejected, leaving counsel in a position where they have an obligation to their client to raise a viable claim but lacking the financial means to develop the facts in the strongest way possible. That problem was somewhat ameliorated by the fact that a couple of experts, including Dr. Zivot, agreed, when faced with the urgency of an execution date, to review Mr. Bucklew's records and render an initial opinion in the mere hope of being paid at some later date. Given

counsel's extreme diligence and repeated efforts to obtain necessary funding to develop a good faith basis for an Eighth Amendment claim, any suggestion that Mr. Bucklew has delayed in bringing his claims is unfounded.

The issues presented are as follows: Should this Court issue a stay of execution to permit Mr. Bucklew an opportunity to appeal on the merits the following claims:

1. Whether the Eighth Amendment is violated by executing a prisoner with a severe and untreatable medical condition that is substantially likely to interfere with vital bodily functions during an execution, thereby causing extreme or protracted pain.

2. Whether a prisoner may properly allege a claim under the Cruel and Unusual Punishment clause of the Eighth Amendment without alleging a known, available alternative method of execution when it is impossible to identify such readily available alternative as the prisoner suffers from a grave, untreatable condition.

3. Whether and to what extent the Due Process Clause of the Fourteenth Amendment entitles a condemned inmate to timely notice of material information about the drug that will be used to execute him.

The immediate issue at present is whether, under *Hill v. McDonough*, 547 U.S. 573, 584 (2006), Mr. Bucklew is entitled to a stay of execution in order to permit him to litigate on appeal the claims presented above. Through the submission of affidavits, medical records and other documents, Mr. Bucklew asserts that he has established a strong factual record supporting his claims – showing the likelihood of success on the merits – and that this Court should therefore grant his request for a stay. If this case is reversed and remanded back to the district court – allowing Mr. Bucklew a full opportunity to develop the facts – he will likely succeed on the merits of his claims. Executing Mr. Bucklew, under Missouri's protocol, poses a very substantial risk that he will hemorrhage, choke or suffocate during the execution, or otherwise suffer excruciating or torturous pain. *See Baze*, 550 U.S. at 50.

## II. Procedural History

The district court's order, attached as Exhibit A, contains a history of the present litigation as well as the related, but factually distinct, litigation in *Zink v. Lombardi*, Case No. 12-4209, in which Mr. Bucklew was also a plaintiff. The *Zink* case has now been dismissed by the district court, and will be returning to this Court for an appeal. The claims in Mr. Bucklew's *present* lawsuit are factually distinct because they involve a legal challenge to Missouri's protocol *as applied* to Mr. Bucklew based on his rare and unique medical condition.

The present lawsuit, *Bucklew v Lombardi*, was filed on May 9, 2014. It was filed as promptly as counsel was able to get it done, working constantly from April 9, 2014 – when the execution date was set – to obtain up-to-date medical records, secure experts willing to work for no present compensation, and to attempt to obtain CJA funding for experts and for counsel. (It is important to note that counsel expended approximately 40 hours developing a proposed budget and a factual basis for it – including affidavits – which were submitted to the district court, and then to this Court in a sealed appeal under the Criminal Justice Act.)

The latest – and still unsuccessful – effort to obtain funding was one more chapter in a long saga that stretches back to 2008, when Mr. Bucklew first sought $7,200 in expert funding from this Court, *ex parte* under CJA, in *Bucklew v. Luebbers*, Case No. 03-3721. The denial was followed by five separate attempts in mandamus proceedings in Missouri state courts seeking an allocation of funds from the Missouri State Public Defender System budget. Those requests, captioned *State ex rel Bucklew v. Robinson*, were denied in Cole County (Case No. 09AC-CC0076), the Missouri Court of Appeals, Western District (Case No. 72984), and three times in the Missouri Supreme Court (Case Nos. 90198, 90924, and 91556). The first two denials were without prejudice, which prompted the subsequent efforts.

In March 2011, appointed counsel filed Criminal Justice Act (CJA) vouchers seeking payment for, *inter alia*, counsel's ongoing efforts to obtain funding for a medical expert. The risks posed to Mr. Bucklew by lethal injection are an issue both in court proceedings and in executive clemency, as the Governor has the power to grant clemency on any grounds, including that the intended execution will inflict pain and suffering on the prisoner in violation of the Eighth Amendment's ban on Cruel and Unusual Punishment. (Indeed, in the past few weeks, undersigned counsel has communicated repeatedly with the Governor's office, through one of his aides, supplying extensive information about Mr. Bucklew's cavernous hemangiomas as well as affidavits from Mr. Bucklew's medical experts).

The district court cut counsels' vouchers by approximately 70 percent and denied any further funding whatsoever. (When Mr. Bucklew's co-counsel unsuccessfully sought review in the United States Supreme Court by filing a petition for certiorari, the State again registered its opposition). Thus, counsel, from February 2012 to the present, has been obligated to represent Mr. Bucklew for no compensation whatsoever, not even for expenses. Mr. Bucklew's counsel, Cheryl Pilate, then returned to the district court in April 2014, again seeking approval of a proposed budget for representation and again requesting fees for expert services, including $7,500 for a physician to review Mr. Bucklew's records,

examine him and render an opinion. That request was rejected, and a subsequent appeal to this Court was also denied on May 13, 2014, in Case No. 14-2020.

Mr. Bucklew's inability to obtain funding has placed him at an extreme and unfair disadvantage. After repeatedly opposing counsels' efforts to obtain funding for a medical expert, the State then asserted that somehow that counsel should have been able, months or years ago, to find experts willing to render opinions – despite the lack of any funding. Such an argument has no merit whatsoever.

Despite these obstacles, Mr. Bucklew was able to locate experts who were willing to review medical records and render an opinion on the mere hope of being paid at a later date. As a result, after dealing with many procedural and practical obstacles, Mr. Bucklew was able to file his lawsuit on May 9, 2014, raising claims under the Eighth Amendment based on the method of execution and failure to provide adequate medical care, as well as under the First and Fourteenth Amendments for violating his right to petition the government for redress of grievances and for meaningful access to the courts.

In addition to filing a Complaint (Doc. #1), Mr. Bucklew also filed a Motion for Temporary Restraining Order and Preliminary Injunction, and a Memorandum in support of the motion. (Docs. ##2 and 3). The Court never held a hearing on the request for a TRO and preliminary injunction, but stated that it was "assum[ing] as

true the information contained in the affidavits supplied by Plaintiff." (Exh. A at 6, n.1).

Mr. Bucklew also filed a Motion for Stay of Execution, seeking a stay of execution under the familiar standard stated in *Hill v. McDonough*, 547 U.S. 573, 584 (2006). In the Court's Order of May 19, 2014, the Court denied Mr. Bucklew's motion for Stay of Execution, as well as his Motion for Temporary Restraining Order and Preliminary Injunction. The district court also dismissed the case in its entirety, stating Mr. Bucklew had failed to show a likelihood of success on the merits.

### III. Factual Background

Mr. Bucklew suffers from a dangerous and, at times, debilitating congenital condition – cavernous hemangioma – that causes clumps of weakened, malformed vessels to grow in his head, face and throat. These growths displace healthy tissue and are prone to rupture under stress and, sometimes, for no reason at all. Mr. Bucklew has suffered from this condition since infancy, which causes constant pain and pressure along with difficulty breathing. Mr. Bucklew's vascular formations have proven resistant to any form of treatment, and surgery has been rejected because the results would disabling and because no surgeon would agree to perform embolization on Mr. Bucklew due to his compromised airway. Various

therapies to treat the hemangiomas – including chemotherapy, radiation therapy and sclerotherapy – have failed.  As early as 1991, a specialist who examined Mr. Bucklew and treated him for years noted that any attempt to surgically remove the vascular tumor "would require extensive surgery which would be mutilating and very risky as far as blood loss."  Ex. 3, at p. 202.

By all accounts, Mr. Bucklew's hemangioma is "massive" and "severe."  In 2003, a doctor examining Mr. Bucklew wanted him examined immediately by a specialist because of the progression of the vascular tumor, which the DOC doctor believed "could be potentially fatal to the patient."  *Id.*  In June 2010, an imaging report stated that Mr. Bucklew's airway was "severely compromised."  *Id.* at 1295. A July 2011 medical report noted there was "difficulty [with] bleeding management."  *Id.* at 2208.  Two months later, another doctor noted the alarming growth of the lesion, stating it encompassed "the entire soft palate and uvula, which are impossible to visualize due to the expansion of the lesion."  *Id.* at 2207. Mr. Bucklew regularly bleeds from his mouth and nose, and occasionally even from his tear ducts.  His massive vascular tumors obstruct his airway, and the DOC's own doctors state that "his airway is severely compromised."  *Id.* at 1295.The hemangiomas cause chronic pain, frequent headaches, spells of dizziness and loss of consciousness.

Mr. Bucklew's medical evidence is uncontroverted and well documented – yet the district court order refers to Mr. Bucklew's severe, lifelong medical condition as if it were a point of debate. Ex. 1, p. 5. ("Specifically, Bucklew suffers from cavernous hemangioma, which he alleges causes clumps of weakened vessels to grow in his head, face, and throat. He alleges that a vascular tumor caused by this condition hemorrhages regularly and obstructs his airway.") The DOC disputes *none* of the evidence supporting Mr. Bucklew's claim, and the medical evidence is gleaned from their own records.

The following are excerpts from the medical records contained in Ex. B, which is a condensed version of Mr. Bucklew's complete DOC medical records:

- "Any removal of this tumor would require extensive surgery which would be mutilating and very risky as far as blood loss." Ex. 3, p. 202;

- "Has had episodes of bleeding to throat, and has been hospitalized several times." *Id*., at p. 142.

- "[C]linically his cavernous hemangioma has increased in size, particularly as evident by a gradually enlarging area of the hemangioma in the posterior oropharynx. This [] raises concerns about potential airway obstruction in the future." *Id*., at p. 141.

- "From all accounts, it appears that he has a *significant hemangioma involving the face and upper airway…causing disfigurement and intermittent bleeding*." *Id.*, at p. 159.

- "Second opinion on recurrent bleeding. I have real concerns that this I/M [inmate] may have future uncontrollable bleeding." *Id.*, at p. 65.

- "Have attempted to schedule PT [patient] for his surgery for his hemangioma. The surgeon who has examined Mr. Bucklew has agreed to do the surgery if someone else will do the embolization treatment [airway

management] prior to the surgical procedure…*I explained to Mr. Bucklew that the procedure is approved and that we cannot find anyone who is willing to do the embolization*." Ex. 4, pp. 2-3. 2010 Cohen Affidavit with Medical Records.

- "PT has vascular malformation for many years. Notes *increased bleeding frequency from oral cavity and nose*. Vascular malformation – face/neck. Recommend: MRI of head/neck. *Need to discuss possible surgical treatment*." Ex. 3 Med. Records, p. 1745.

- "Mr. Bucklew was referred to the clinic for evaluation of an extensive cavernous hemangioma, which extends to the upper lip on the midline and encompasses all of the palate, the entire soft palate and the uvula, *which are impossible to visualize due to the expansion of the lesion*. The lesion also extends into the right cheek and the entire right maxilla. *This has been present for 20 plus years but has increasingly grown larger and larger.*" *Id*., p. 2207.

- MRI: "…In the pharynx, the mass occupies a large space within the oropharynx and hypopharynx. *The airway is severely compromised at this site*. A tracheostomy is noted in the upper thorax." *Id*., at p. 1295.

- "Emergency Room Contact: 4 hrs ago muscles in back of jaw tightened up and began bleeding. Feels hemangioma has blown up. Feels it is getting harder to breathe. Feels dizzy when standing. Assessment: *oral hemangioma hemorrhage*. ENT consult." *Id*., at p. 147.

- "The last encounter I have in the patient's University chart appears to be an emergency room visit in which Mr. Bucklew presented with *oral facial hemorrhages which were reported to be occurring 3-5 times per week*." *Id*., at 159.

- "Referral Reasons Form. CT with contrast, 4 vessel angiogram to delineate anatomy and vascular supply. *Audiogram requested after visit at Barnes regarding recurrent bleeding of hemangioma.*" *Id*., at p. 62.

- "Pt had ENT eval[uation] per Dr. Zitch at UMMC 6/2/10 re cavernous hemangioma with *increasing frequency of bleeding oral cavity and nose*." *Id*., at p. 1461.

- "Pt typically has *more pain and incidents of bleeding* in cold weather. He requests more Tramadol for PRN pain. *History of recurrent intermittent*

*bleeding*.  CURRENT PAIN MEDS Tramadol and Neurontin.  Increase Tramadol to 50mg PRN." *Id*., at p. 2240.

- "44 [year old] with known large cavernous hemangioma. He reports he had severe pain upon leaving his cell last PM, became lightheaded and LOC [loss of consciousness] but no injury. He was CODE 16 [medical emergency].…*Later he was another CODE 16 [medical emergency] with complaints of facial pain bleeding from hemangioma*.  Pt was brought to medical and on-call physician ordered Vicodin.  Bleeding ceased with pressure per gauze." *Id*., at p. 2238.

- "Dizziness, facial edema.  Pt reports he had 'a lot of pain' described as constant rather then the pulsating pain he typically has.  Pain was located in area of Rt eye and ear; awakening him from sleep early yesterday AM. Pt reports, "it blew" meaning started bleeding in Rt post area of his mouth with relief. *Give Pt gauze and biohazard bags PRN due to bleeding*." *Id*., at p. 2227.

"Russell Bucklew appears to have serious medical issues," the DOC reluctantly and belatedly acknowledges, but still it offers no reasonable plan to execute Mr. Bucklew within the confines of the United States Constitution. (Doc. 8, at 1). The DOC has recognized the risks involved in attempting to execute Mr. Bucklew. Shortly after counsel produced the affidavit from Dr. Zivot (Doc. 1-1) and sought access to Potosi Correctional Center so that Dr. Zivot could personally examine Mr. Bucklew, the AG's Office and counsel for the DOC began suggesting imaging studies of Mr. Bucklew – initially proposing venous studies of Mr. Bucklew's arms in a phone call on May 7, 2014, then agreeing that a MRI of his head was necessary.  After 5:00 p.m. on Friday, May 9, 2014, DOC counsel and the AG's Office both sent emails to Mr. Bucklew's counsel proposing an MRI and providing a scheduling number for St. Mary's Hospital in Jefferson City.  (Docs. 6-1, 6-2).

Neither the DOC nor the AG's Office proposed which doctor should order the testing, who should interpret the testing and images, or who should pay for it.

The DOC argues that Mr. Bucklew's request for a temporary restraining order and preliminary injunction is "untimely insofar as it relies on a request for testing that cannot be completed before Bucklew's scheduled execution." (Doc. 8, p. 9). If there is not sufficient time to perform the required testing, the fault lies with the DOC, which has known about Mr. Bucklew's serious medical condition, his propensity to hemorrhage and his "severely compromised airway" for years. The primary reason Mr. Bucklew is in this position, shortly before the scheduled execution, is because the DOC has not obtained the medical care and diagnostic testing that they are obligated to provide to Mr. Bucklew. Mr. Bucklew's counsel informed the DOC that medical providers were willing to conduct the necessary testing, but that a doctor, acting as Mr. Bucklew's treating physician, had to order the tests. Counsel heard nothing from the DOC after conveying this information. It is likely, though only the DOC can confirm, that they are unable to obtain the consent of any doctor to order the tests in an attempt to clear Mr. Bucklew for execution, because Corizon and PharmaCorr, the providers of medical care to DOC inmates, "do not participate in executions in any way. Corizon and PharmaCorr do

not participate in executions in Missouri or any other state."[1]  The DOC alone

bears the responsibility to provide medical care and to ensure that a doctor is

obtained who can order the necessary tests.  The DOC is responsible for ensuring

that their lethal injection protocol comports with the Eighth Amendment as applied

to Mr. Bucklew.  The DOC cannot pass this responsibility to Mr. Bucklew when

only the DOC is in the position to order the tests.

Mr. Bucklew's medical condition is complex and severe – and it requires

powerful pain medication multiple times each day.  Mr. Bucklew's medical records

provide the factual backdrop for Mr. Bucklew's *Baze* claim and enable him to meet

*Baze's* demanding burden of proof.

## IV.  Argument

### A.    Whether the Eighth Amendment Is Violated by Executing a Prisoner With a Severe and Untreatable Medical Condition That Is Substantially Likely to Interfere With Vital Body Functions During an Execution, Thereby Causing Extreme or Protracted Pain.

Mr. Bucklew requested a stay of execution in the district court, arguing that

Missouri's lethal injection protocol, as applied to him, creates a substantial risk

that he will suffer constitutionally intolerable pain and suffering in violation of the

---

[1] Bob Priddy, Prison Healthcare Company Says It Makes No Death Drugs, MissouriNet, Jan. 24, 2014.

Eighth Amendment. The district court denied the stay, concluding that Mr. Bucklew failed to state an Eighth Amendment claim. Doc. 17, p. 13.

### 1. The *Baze* Standard – Substantial Risk of Harm

An execution method violates the Eighth Amendment when it creates "a substantial risk of serious harm." *Baze v. Rees*, 553 U.S. 35, 50 (2008) (opinion of Roberts, C.J.); *Nooner v. Norris*, 594 F.3d 592, 599 (8th Cir. 2010). *Landrigan* stands for the proposition that a speculative Eighth Amendment claim does not justify a stay of execution. *Brewer v. Landrigan*, 131 S. Ct. 445 (2010); *Whitaker v. Livingston*, 732 F.3d 465 (5th Cir. 2013). Unlike the court in *Landrigan*, this Court need not speculate as to whether the risk of unnecessary pain is both real and very likely. Mr. Bucklew has met his burden, and the district court's ruling to the contrary was error. The risks to Mr. Bucklew during an execution are both unprecedented and extreme. Mr. Bucklew has offered far more than mere speculation – he has offered concrete, uncontroverted medical evidence and expert affidavits that Missouri's lethal injection protocol, as applied to him, creates a substantial risk of severe and needless pain.

It is elementary that Mr. Bucklew must plead the "core elements" of the relevant cause of action: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### 2. Missouri's Lethal Injection Protocol Violates the Eighth Amendment As Applied to Mr. Bucklew

Mr. Bucklew cited the affidavits of Drs. Zivot, Jamroz and Sasich, which – drawing on the DOC's own medical records – stated that a substantial likelihood exists that Mr. Bucklew will suffer needless pain and suffering during his execution. *See* Docs 6-4, 6-9, 6-10. Mr. Bucklew presented uncontroverted evidence proving a substantial risk that he will: (1) suffer hemorrhaging in his face, mouth, or throat, resulting in bleeding in his facial orifices and/or bleeding into his airway causing him to suffocate; (2) experience a spike in blood pressure as a result of stress or the chemical used to flush the IV line, thus further increasing the risk of a hemorrhage and suffocation; (3) suffer adverse medication interactions; and (4) suffer a prolonged and excruciating execution because of the failure of the lethal drugs to circulate properly due to his massive vascular tumor. *See* Doc. 6, p. 22.

The district court was presented with undisputed medical history – spanning more than two decades – that documented in great detail Mr. Bucklew's rare and

serious medical condition. The DOC makes no attempt to refute Mr. Bucklew's factual showing that Missouri's protocol, *as applied to him*, creates a "significant risk" of substantial harm. The DOC still offers no expert evidence to refute the opinions of any expert offered by Mr. Bucklew.

Mr. Bucklew has presented two affidavits from Dr. Zivot (Docs. 6-4, 7-1), a board-certified anesthesiologist who teaches at Emory University School of Medicine, and an affidavit from Dr. Gregory Jamroz (Doc. 1-2), who practices at St. Luke's Hospital in St. Louis – both of whom state that Missouri's method of lethal injection poses unique risks to Mr. Bucklew, as his large hemangiomas are likely to impair the proper circulation of the lethal drug, leading to a prolonged and problematic execution. Such an execution is highly likely to be excruciating. Dr. Zivot states that a substantial risk exists that Mr. Bucklew's hemangiomas will rupture and bleed during the execution, causing Mr. Bucklew to choke and cough, which he "will experience as severe pain and suffocation." (Doc. 1-1).

On May 12, 2014, Dr. Zivot examined Mr. Bucklew and supplemented his original affidavit. (Doc. 7-1). The DOC, despite being noticed of the affidavit on May 14, 2014, has failed entirely to respond to Dr. Zivot's observations and opinions. Dr. Zivot observed what the DOC's treating physicians themselves have said repeatedly – that Mr. Bucklew's airway is "severely compromised or obstructed due to the hemangiomas. It is also friable, meaning it could tear or

rupture." *Id*., p. 1. That puts Mr. Bucklew at grave risk during the execution – coughing, choking, and straining to breathe could all lead to a full obstruction of his airway and suffocation. *Id.*

There is substantial risk that because of Mr. Bucklew's massive cavernous hemangioma that the lethal drug will not circulate as intended, resulting in a prolonged, excruciating death. The presence of Mr. Bucklew's cavernous hemangiomas "creates alternative low-resistance pathways to injected drugs. It is very likely that this abnormal circulation will inhibit the effectiveness of the pentobarbital, thereby delaying the depression of Mr. Bucklew's central nervous system." (Doc 1-1, p. 4).

The DOC's protocol is the proverbial moving target – they have changed their execution procedures ***twice since May 13, 2014***. On Tuesday, May 13, 2014, the DOC informed counsel that they would not use methylene blue in Mr. Bucklew's execution because of the blood pressure risks Dr. Zivot identified, indicating that they would instead use the substance indigo carmine with the saline solution in the IV line instead. Counsel immediately contacted expert Dr. Larry Sasich, who informed counsel that indigo carmine was not a safe substitute for methylene blue because it also causes spikes in blood pressure *and* has an added risk of causing IV line blockage. Counsel immediately informed the DOC of the

problems with their hastily chosen substitute. (Doc. 12-2, email from counsel to the DOC on May 13, 2014, following consultation with Mr. Bucklew's expert).

On May 16, 2014 – just five days before the scheduled execution – the DOC revealed in their Response **another** hastily made change – indicating that they will not use indigo carmine because of the risks posed to Mr. Bucklew, stating: "The Department of Corrections will not use methylene blue in Bucklew's execution and will not use indigo carmine, a dye which also may raise blood pressure, or any other dye." (Doc. 8, p. 7). The DOC's constant shifts in protocol reveal recklessness and careless disregard for the safety of Mr. Bucklew, and create substantial risks of harm. Why was it Mr. Bucklew's expert, rather than the State's execution doctor, who warned the DOC of the well-documented risks of methylene blue and then indigo carmine? Why doesn't the State's allegedly board-certified anesthesiologist know of these risks?

What will the DOC now use to flush the IV line and ensure the lethal chemical is moving properly? Nothing? A secret, undisclosed substance? This change in protocol was not noticed, Mr. Bucklew has no knowledge whatsoever about the substance the DOC has chosen to replace methylene blue, and as a result Mr. Bucklew has no opportunity to investigate whether the chosen alternative poses even greater risks to him.

These abrupt, last-minute changes are further evidence that DOC officials do not know what they are doing and are wholly unprepared to execute someone with the serious medical problems Mr. Bucklew has. The switch to indigo carmine and then its abrupt rejection is particularly troubling, as it indicates the DOC did nothing to investigate this substance before informing Mr. Bucklew's counsel that it would be replace methylene blue.

Now, the DOC states it is using *no* dye. This, too, is troubling, and requires the execution team – whose members include non-medical personnel – to carry out a protocol that they are not trained in. The DOC protocol included methylene blue for an important reason; otherwise the DOC would not have included it. Now, the DOC proposes nothing, or a totally unknown substance, in its place. This raises a critical question: how will the execution team, remotely stationed in the "execution support room," confirm that the IV line is flowing properly or continuing to flow when the dye is no longer used? The very fact the DOC is making these last minute, knee-jerk changes to the protocol is evidence that the DOC realizes that their protocol presents substantial risks to Mr. Bucklew. Reactionary changes at the eleventh hour, without the guidance of imaging or tests, create a substantial risk to Mr. Bucklew, who suffers from a complex and severe medical condition ***that has compromised his veins***. The DOC has not met their burden of providing a protocol that comports with the Eighth Amendment.

As numerous medical records and DOC's own doctors have indicated, Mr. Bucklew's airway is severely compromised. He struggles to breathe when lying flat, and the staff at Potosi Correctional Center issued Mr. Bucklew extra pillows so he could be elevated while sleeping. Dr. Zivot, after examining Mr. Bucklew in person on May 12, 2014, agreed with the many other medical providers' observations: "Mr. Bucklew experiences constant shortness of breath as a consequence of his partial airway obstruction. Mr. Bucklew is unable to sleep in a normal recumbent position because of airway obstruction. [The obstruction] worsens when he is recumbent, even when recumbent for only a few moments." (Doc. 7-1, p. 2). The DOC, in response to Dr. Zivot's warning, indicated "the anesthesiologist who is a member of the execution team can make sure Bucklew is placed on the gurney in a proper position." (Doc. 8, p. 8). The DOC seems to acknowledge they agree with Dr. Zivot that Mr. Bucklew's obstructed airway presents substantial risks of needless pain and suffering, but what they plan to do about it is a mystery. Will they execute Mr. Bucklew in a seated position? Has the execution team been trained about this drastic change in Missouri execution procedure? It is highly unlikely that the DOC has had time to train the execution team on protocol changes that are just days old. The DOC's continued last minute changes create a substantial risk of harm absent an opportunity for the execution team to train using these new protocols. The DOC should be required to disclose

how it plans to execute Mr. Bucklew so that this Court can properly assess whether additional risks are present. Currently, the DOC can make as many changes to the protocol that it desires without having to give notice to Mr. Bucklew, with no oversight, no accountability and no judicial scrutiny.

We can have no confidence in the DOC's empty assertion that all is well as it applies to Mr. Bucklew, who suffers from a serious, documented medical condition that partially obstructs his airway and fills his head, neck and throat with weak, distended vessels. *The DOC has offered no evidence to controvert Mr. Bucklew's medical evidence. DOC officials have had ongoing and unfettered access to Mr. Bucklew's medical records and have the resources to obtain expert opinions. Yet, they offer no evidence to dispute Mr. Bucklew's assertions, and no evidence in support of their assertion that their protocol will work as intended with Mr. Bucklew.* In contrast, Mr. Bucklew has squarely met his burden and has shown a substantial risk of severe harm and excruciating pain. *Baze v. Rees,* 550 U.S. 35, 50 (2008); *Brewer v. Landrigan*, 131 S. Ct. 445 (2010).

Mr. Bucklew's documented medical history, on its face, indicates a substantial risk of a botched execution. Until Mr. Bucklew knows what protocol the DOC will use to kill him, and until the DOC is required to conduct the necessary imaging and testing to quantify the expansion of Mr. Bucklew's hemangiomas and the extent of his airway obstruction, it is not possible to execute

him without substantial risk of severe pain and needless suffering.   Mr. Bucklew's rare and severe medical condition presents known, substantial risks – including that the drug will not circulate properly, that his severely compromised airway will cause choking and suffocation, and that his already engorged hemangiomas will hemorrhage as a result of a spike in blood pressure due to the DOC's use of an unknown, secret dye.   Until the DOC accounts for these risks by obtaining the imaging and testing they are constitutionally obligated to provide Mr. Bucklew, he cannot be executed within the confines of the Eighth Amendment.

**B.      Whether a Prisoner May Properly Allege a Claim Under the Cruel and Unusual Punishment Clause of the Eighth Amendment Without Alleging a Known, Available Alternative Method of Execution When It Is Impossible to Because the Prisoner Suffers from a Grave and Untreatable Medical Condition.**

Throughout its Order, the district court repeatedly indicates it is rejecting Mr. Bucklew's claim because he has failed to allege he may be executed by an alternative, feasible and more humane method of execution.  (*See, e.g.,* Exh. A at 10, 11, 12).   The district court holds that the alternative method must be "feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain."  *Id*. at 12 (citing *Baze*, 553 U.S. at 52).  The court also indicated it was guided by the precedent set in *In re George Lombardi*, 741 F.3d 888 (8th Cir. 2014) ("*Lombardi I*") and *In re Lombardi*, 741 F.3d 903 (8th Cir. 2014) ("*Lombardi II*").

Mr. Bucklew asserts that *Baze* and *Hill* do not require him, as a condition of alleging an Eighth Amendment claim, to assert that the current method of execution – lethal injection by compounded pentobarbital – creates a substantial risk of harm when compared to known and available alternatives. *See In re Lombardi,* 741 F.3d at 905. The district court appeared to extend the "alternative method" requirement even further, holding that the "alternative procedure must be feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain." (Exh. A at 12, citing *Baze,* 553 U.S. at 52).

In the present case, given Mr. Bucklew's severe and untreatable condition, the lack of recent imaging studies (MRIs and CT scans) and the lack of knowledge of what "feasible" alternatives the State of Missouri is prepared to implement, it is difficult, if not impossible, to allege such an alternative. In fact, Mr. Bucklew alleged in his Complaint that, "[a]bsent a thorough physical examination and complete imaging studies, it is not even possible to state whether a constitutional method of executing Mr. Bucklew by lethal injection exists." (Doc. 1 at 22, ¶79).

1.      The Holding That an Eighth Amendment Claim Concerning the Manner of Execution Must Be Dismissed Unless It Alleges an Alternative Manner of Execution Misreads *Baze v. Rees* and Contradicts *Jones v. Bock* and *Hill v. McDonough.*

The district court's holding misreads *Baze v. Rees*, 553 U.S. 35 (2008). In *Jones v. Bock*, 549 U.S. 199, 213 (2007), which preceded Baze, this Court held,

In *Hill v. McDonough*, 547 U.S. 573 (2006), we unanimously rejected a proposal that §1983 suits challenging a method of execution must identify an acceptable alternative: "Specific pleading requirements are mandated by the Federal Rules of Civil Procedure, and not, as a general rule, through case-by-case determinations of the federal courts" *Id.*, at 582).

But *Baze* did not distinguish, or even cite, *Jones* or *Hill*. The Court in *Baze* was confronted with the specific claim that Kentucky's execution protocol violated the Eighth Amendment **because** the state could easily change to a one-barbiturate method or at least discontinue the use of the paralytic agent pancuronium bromide. *Id.* at 56-57. That specific claim required the prisoner to show that the proposed alternative was feasible, available, and likely to reduce a significant risk of pain. *Id.* at 52, 61. The *Baze* opinion simply addressed the claim before this Court. It did not erect a new standard for pleading or proving **every** Eighth Amendment claim relating to manner of execution. In order to do so, it would have had to overrule *Jones* and *Hill*.

This Court has repeatedly held that there is a presumption that it does not overrule previous precedent *sub silentio*, and that the courts of appeals should not presume that it has done so. *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*."); *Agostini v. Felton*, 521 U.S. 203, 237 (1997);

*Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.")

Mr. Bucklew's argument is materially different than that in *Baze*. His claim is that the Missouri execution protocol violates the Eighth Amendment *in his case, based on his unique risks,* because it creates "a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'"[2] *Baze* simply did not hold that the **only** way to demonstrate a "substantial risk of serious harm" is to show that there is an available alternative. That was one argument advanced by the Kentucky plaintiffs, but it was not held to be dispositive, because the Court approved the *existing* Kentucky protocol.

In its order denying rehearing following *Lombardi II*, the Eighth Circuit implicitly conceded that *Hill v. McDonough*, 547 U.S. 573 (2006), is still good law, but attempted to distinguish *Hill* by noting that in that case, the petitioner had stated that "the challenged procedure presents a risk of pain the State can avoid while still being able to enforce the sentence ordering a lethal injection." *Id.* at

---

[2] *Baze v. Rees*, 553 U.S. 35, 50 (2008), quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846 & n.9 (1994).

482.  Mr. Bucklew's pleadings never suggested that the State cannot constitutionally use *some method* to execute him.  Rather, his claim hinged his argument that, "absent a thorough physical examination and complete imaging studies," it was not even possible to attempt to identify whether a constitutional method of executing Mr. Bucklew by lethal injection exists.

Mr. Bucklew respectfully submits that the Eighth Circuit's construction of Baze is erroneous.  Indeed, the Eighth Circuit's construction overrules *Baze* itself.  If a plaintiff, *before conducting discovery*, must allege an available alternative to the current protocol, then it will in effect be impossible to prosecute an Eighth Amendment claim against *any* method of execution.  Since *Baze* (as well as *Hill v. McDonough*, 547 U.S. 573 (2006)) recognized that such a claim is permissible under §1983, the Eighth Circuit's reading is contrary to this Court's opinions in both cases.

As the dissent notes in *Lombardi II*, before this opinion, the Eighth Circuit itself had not required plaintiffs bringing Eighth Amendment method-of-execution challenges to allege an alternative method of execution.  In *Clemons v. Crawford*, 585 F.3d 1119 (8th Cir. 2009), the court addressed the sufficiency of pleadings under the motion to dismiss standard. The opinion did not require plaintiffs to plead an alternative method of execution to meet that standard.  *See also Nooner v. Norris*, 594 F.3d 592 (8th Cir. 2010).  Similarly, the Ninth Circuit opinions in

*Cook v. Brewer*, 637 F.3d 1002 (9th Cir. 2011), and *Cook v. Brewer*, 649 F.3d 915 (9th Cir. 2011), also failed to require the allegation of an alternative method of execution.

The Courts of Appeals are divided on this issue; the Fifth and Sixth circuits have expressly held that in order to prevail on a manner of execution challenge under the Eighth Amendment, the plaintiff must show that the risk of pain is "substantial when compared to the known and available alternatives." *Raby v. Livingston*, 600 F.3d 552, 560-61 (5th Cir. 2010) (affirming summary judgment); *Cooey v. Strickland*, 589 F.3d 210, 220 (6th Cir. 2009) (denying stay of execution). Although these two decisions were not decided on the liberal pleading standard of a motion to dismiss, the fact that they espouse a requirement that a successful plaintiff prove the absence of an alternative shows that they have misapprehended *Baze.*

The ruling below makes the Eighth Amendment all but inoperable in lethal injection cases.  Therefore, Court should grant Mr. Bucklew's motion for stay, and allow Mr. Bucklew full merits. briefing so this Court may reconsider its prior opinions in *In re Lombardi I* and *Lombardi II*, in light of *Baze v. Rees*, 553, U.S. 35, 50 (2008); *Jones v. Bock*, 549 U.S. 199, 213 (2007), and *Hill v. McDonough*, 547 U.S. 573 (2006).

**2.     In the absence of recent medical imaging and testing, and in light of the progressive and untreatable nature of Mr. Bucklew's condition, it is impossible at this juncture to allege a "feasible, readily implemented" alternative procedure that "significantly reduce[s] a risk of severe pain."**

As the district court acknowledged, Mr. Bucklew has alleged that a substantial risk that he will (1) suffer hemorrhaging in his face, mouth or throat, resulting in bleeding into his airway and subsequent suffocation; (2) experience a spoke in blood pressure, as a result of the use of methylene blue (if it is used), or alternatively as a result of stress, heightening the risk of vascular rupture; (3) struggle to breathe or even suffocate because of the partial blockage of his airway, caused by the hemangiomas; (4) suffer adverse medication interactions, which may have the effect of increasing pain; and/or (5) suffer a prolonged, excruciating execution because of the failure of the lethal drugs to properly enter or circulate in Mr. Bucklew's body due to the vascular malformations.  (Exh. A at 8; DCD 6 at 14).

These risks are unique and specific; they are not remote and speculative. After examining Mr. Bucklew at Potosi Correctional Center, Dr. Zivot observed that Mr. Bucklew's airway was friable, meaning "it is weak and could tear or rupture" and that risks from Mr. Bucklew's partially obstructed airway were

greater if he was lying flat, as his airway is more obstructed in that posture."
(DCD 7 at 2, and attached Exhibit 1)

Dr. Zivot also stated that because of the immense risks associated with executing Mr. Bucklew by lethal injection, that it was critical to obtain adequate imaging studies, including an MRI, high resolution CT scan, and possibly an angiogram. (DCD 7 at 3, and attached Exhibit 1).

Under all of these circumstances, based on what is known at present, Mr. Bucklew is severely hindered in alleging a "feasible, alternative" method by which he may be executed. Missouri's statute, Mo. Rev. Stat. 546.720 provides only for execution by lethal gas or lethal injection. Mr. Bucklew is not aware as to whether the State of Missouri is prepared to carry out any executions with lethal gas. Given the risks posed to him by lethal injection and the failure of the State to obtain adequate imaging studies, it is not possible at present to allege a "feasible, alternative" method of execution that would not violate the Eighth Amendment.

**3.    Requiring Counsel to Propose an Alternative Means of Execution Violates Ethics Rules Unless the Client So Directs, and Also Creates           an Untenable Conflict of Interest.**

The pleading standard articulated by this Court and the district court would require Counsel and other death row attorneys to routinely violate Missouri attorney ethics rules. Mr. Bucklew's attorneys cannot suggest any means for the

state of Missouri to kill him because he has neither selected a means of death nor directed his attorneys to seek such means. In every lawyer-client relationship, "the client, not the lawyer, determines the goals to be pursued." Restatement (Third) of the Law Governing Lawyers, § 16A cmt. c (2000). Rule 1.2 of the Missouri Rules of Professional Conduct plainly requires a lawyer to "abide by a client's decisions concerning the objectives of the representation." *See* Missouri Rules of Prof'l Conduct R. 4-1.2(a) (2008).

By determining that *Baze* closes the courthouse door to Mr. Bucklew's Eighth Amendment pleading if Counsel fails to recommend another method for killing him, this Court disregards Counsel's professional requirement under Rule 1.2(a). The Court would instruct Counsel to abandon the client's objective and instead to concede the constitutionality of an untested method of execution. If Counsel meets this Court's understanding of the pleading standard by conceding an alternative means for the State to execute Mr. Bucklew, Counsel would violate Rule 1.2 by contradicting Mr. Bucklew's decision-making authority as client. But if Counsel wants to avoid violating Rule 1.2 by not providing an alternative means of execution in the pleading, Counsel has arguably violated Rule 1.3's requirement of diligence by refusing to comply with the alleged pleading requirement. *See* Missouri Rules of Prof'l Conduct R. 4-1.3 (2007).

Refusal to engage in the macabre task of actively supporting an alternative method of execution protects an important right for Mr. Bucklew. As the U.S. Supreme Court has held, "[b]y declaring his method of execution, picking lethal gas over the State's default form of execution – lethal injection – [a death row inmate] has *waived any objection* he might have to it." *Steward v. LaGrand*, 526 U.S. 115, 119 (1999) (emphasis added). Mr. Bucklew – and his Counsel – therefore are forced to abandon an important Eighth Amendment argument if they are required to affirmatively choose a method of execution.

Mr. Bucklew's attorneys cannot advocate for the State to kill Mr. Bucklew by any specific method because advocating for the State's objective of killing Mr. Bucklew would create a concurrent conflict of interest and nonsensically require removal of Mr. Bucklew's Counsel. The concurrent conflict rule prohibits representation if "there is a significant risk that the representation … will be materially limited … by the lawyer's responsibilities … to a third person …" Missouri Rules of Prof'l Conduct R. 4-1.7(a)(2). The conflict that arises from this Court's interpretation of *Baze* is intrinsic to the representation. This Court would require Counsel to make an argument that cuts against the very goal of the client's representation: preventing his execution. This Court's interpretation of *Base* not only ignores that client-defined objective, but it describes advocacy on "behalf" of the death row inmate as a concession to the State's desired result: that an

alternative method of execution is constitutional. This is a cognizable, even palpable, conflict that poses all the dangers of the more traditional, extrinsic conflicts of interests.

By embracing this Court's proposed conflict of interests and helping the State select a method to kill Mr. Bucklew, his attorneys would become ineffective. The U.S. Supreme Court has repeatedly recognized that the Sixth Amendment right to effective assistance of counsel includes the right to a representation free from conflicts of interest. *See Glasser v. United States*, 315 U.S. 60, 70 (1942). "[T]he rule against representing adverse interests [of present clients' was designed to prevent a … practitioner from having to choose between conflicting duties, or attempting to reconcile conflicting interests rather than enforcing a client's rights to the fullest extent." *Smiley v. Dir. Office of Workers Comp. Programs*, 984 F.2d 278, 282 (9th Cir. 1993). Requiring Counsel to argue in favor of a method for killing Mr. Bucklew is decidedly unjust, prohibiting Counsel from "enforcing [the] client's rights" – or pursuing Mr. Bucklew's wishes – "to the fullest extent." *Smiley*, 984 F.2d at 282.

Generally, the Rules address conflicts of interest by requiring the lawyer to remove herself from the representation. *See* Missouri Rules of Prof'l Conduct R. 4-1.7, cmts. [2]-[4] (2007). Under the circumstances of this case, however, such a remedy is both impractical and illogical. Removal would bring heavy burdens by

replacing Counsel who are familiar with the case's complex facts and Byzantine procedural history with less well-informed counsel. Replacement, in turn, would fail as a remedy because the new counsel would labor under the same conflict. A death row lawyer would breach his duty of diligence should he fail to pursue a claim that might secure his client's desired outcome. *See* Missouri Rules of Prof'l Conduct R. 4-1.3 (2007).

## C. Whether the Due Process Clause of the Fourteenth Amendment Entitles A Condemned Prisoner to Timely Notice of Material Information About the Drug That Will Be Used to Execute Him.

### 1. The district court's due process analysis of Mr. Bucklew's claim is fundamentally flawed.

Relying on the standard articulated by this Court that requires Mr. Bucklew to assert "a plausible allegation of a feasible and more humane alternative method of execution, or a purposeful design by the State to inflict unnecessary pain," *In re Lombardi*, 741 F.3d 888, 896 (8th Cir. 2014), the district court determined Mr. Bucklew failed to state an Eighth Amendment claim, dismissed the count, and reasoned it "need not consider the remaining factors for a stay." (Doc. 17, at 13).

Leaning on *Lewis v. Casey*, 518 U.S. 343, 356 (1996), the district court reasoned that due process guarantees a prisoner only "the capability of bringing contemplated challenges to sentences or conditions of confinement[.]" The district court takes the position that it matters not that Defendants have fought tooth and nail to avoid providing Mr. Bucklew with the very information he requires to meet

the district court's – and this Court's – extremely high pleading standard. While Defendants' obstinance may have "hindered Bucklew's ability to discover grievances and effectively litigate any challenge to the drug's use," the court insists, it has by no means "obstructed [Mr. Bucklew's] ability to file a suit." (Doc. 17, pp. 15-16). In fact, the district court claimed, "[t]his lawsuit itself is evidence of Bucklew's ability to challenge the drug's use." *Id.* at 16.

Mr. Bucklew is to be executed in less than 24 hours with a drug that Defendants have not only made a moving target for discovery, but fought at every turn to avoid providing information about. In the past week alone, Defendants have haphazardly, hastily changed multiple aspects of their protocol – first removing methylene blue only to replacing it with indigo carmine, a dye that is more dangerous still, and now stating they will not use either substance. What will Defendants use? Mr. Bucklew can only guess.

Defendants' calculated game of hide-the-ball forecloses Mr. Bucklew from pleading a cognizable Eighth Amendment claim regarding the risks lethal injection poses to him (and him alone) as a result of his rare, painful, congenital medical condition. The district court once remarked that it "weigh[ed] heavily on the court" that its own rulings and the Eight Circuit's interpretation of *Baze v. Rees* "made it impossible for [a plaintiff] to discover the information necessary to meet his burden." *Zink v. Lombardi*, No. 2-12-CV-4209-BP, Doc. 308 at p. 7 (W.D.

Mo. Jan. 27, 2014). Now, however, it evidences no concern that in so doing, it renders due process a hollow right indeed: Defendants are rewarded for obfuscation while Mr. Bucklew is deprived the notice necessary to raise a meaningful challenge to his execution. The "ability to bring a lawsuit" is not merely the right to file a document asserting a grievance with the court, as the district court suggests, and such an interpretation of the Due Process Clause renders that constitutional provision an illusory protection at best.

The district court entirely avoided analyzing Mr. Bucklew's procedural due process claims using the two-part framework articulated by the United States Supreme Court, which requires considering first whether the state's action interferes with Mr. Bucklew's life, liberty, or property, *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989), and if so, proceeding to "examine whether the procedures attendant upon that deprivation were constitutionally sufficient," using the three-part framework of *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Id.* Each prong of the *Mathews* test weighs in favor of granting Mr. Bucklew relief.

## 2. Defendants' Lethal Injection Protocol Implicates Mr. Bucklew's Life Interest.

The means by which Defendants will effect his execution implicates Mr. Bucklew's life interest in avoiding "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). Procedural due process, in turn,

protects Mr. Bucklew's right not to be executed in a manner that violates the Eighth Amendment. *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 281 n.3 (1998)("This substantive constitutional prohibition [against cruel and unusual punishment] implicate[s] due process protections.").

The Eighth Amendment prohibits Defendants from conducting an execution in a manner that produces an "unnecessary and wanton infliction of pain." *Gregg*, 428 U.S. at 173. Indeed, the Supreme Court in *Baze* squarely held that the Eighth Amendment forbids states from injecting combinations of drugs that inflict unnecessary pain and suffering, concluding in that case that without a sedative, the injection of pancuronium bromide and potassium chloride would present "a substantial, constitutionally unacceptable risk of suffocation." *Baze*, 553 U.S. at 53. The *Baze* Court further held that because it is typically impossible to determine in advance whether an inmate will suffer from unnecessary pain, "subjecting individuals to a risk of future harm" violates the Eighth Amendment, so long as "the risk is substantial when compared to the known and available alternatives." *Id.* at 49, 61. For the reasons that follow, due process entitles Mr. Bucklew – whose risk of future harm arising from his preexisting medical condition is foreseeable and substantial – to timely notice of material information about the lethal drug that will be used to execute him and that may violate his

interest in a humane death so that he may be assured of the full and fair hearing the Constitution affords him.

### 3.    Mr. Bucklew's Life Interest Entitles Him to Notice of Material Information About the Lethal Drug With Which He Will Be Executed.

Because Mr. Bucklew's interest in avoiding an inhumane execution is constitutionally cognizable, the manner in which he is executed is subject to the requirements of procedural due process. "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected . . . must first be notified.'" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quoting *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1863)).  Notice is not an end to itself, but rather intended "to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing,'" *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 (1978), during which he has "an opportunity to present [his] objections," *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  *If the right to notice and a hearing is to have substance, "it must be granted at a time when the deprivation can still be prevented." Fuentes*, 407 U.S. at 81 (emphasis added).  The "specific dictactes of due process" in Mr. Bucklew's case, as determined using the three *Mathews* factors, demand that Defendants disclose material information about the drug that will be used in his execution.

First, Mr. Bucklew's interest in vindicating his Eighth Amendment right doubtlessly carries significant weight. "[D]eath is a different kind of punishment from any other which may be imposed in this country . . . in both its severity and its finality." *Gardner v. Florida*, 430 U.S. 349, 357 (1977) (plurality opinion). Because the consequences of executing Mr. Bucklew in a cruel and unusual manner are "horrendous," *Baze*, 553 U.S. at 117 (Ginsburg, J., dissenting), his private interest in avoiding unnecessary pain during death is "almost uniquely compelling," *Ake v. Oklahoma*, 470 U.S. 68, 79 (1985), and far less weighty interests than that asserted here have enjoyed due process protection. *See, e.g., Goss v. Lopez*, 419 U.S. 565, 572-76 (1975)(protected interest in funds held in prison accounts).

Further, the risk that Mr. Bucklew will be erroneously and torturously deprived of his life interest is substantial unless he receives a timely, full disclosure of information regarding the substances Defendants intend to inject into his veins. Three recent executions shed light on the substantial risk of serious harm that execution drug failure can cause. Twelve seconds into his execution in Oklahoma, which utilized a three-drug cocktail that included pentobarbital obtained from an unnamed compounding pharmacy within the state, Michael Lee Wilson uttered his

chilling final words: "I feel my whole body burning."[3]  A week later, Ohio

executed Dennis McGuire with a combination of drugs never before used in lethal

injection in the U.S., and he "struggled, made guttural noises, gasped for air and

choked for about 10 minutes."[4]  Finally, Clayton Lockett's execution in Oklahoma

just weeks ago was horribly botched:  he regained consciousness, writhed, groaned

and took 43 minutes to die, reportedly from a heart attack – though that was only

after the blinds were drawn on the execution chamber to obscure what really

happened from public scrutiny.[5]  There is accordingly a significant "value . . . [in]

additional . . . procedural safeguards," *Mathews*, 424 U.S. at 335, when it comes to

death, the most exacting of punishments the state can impose on its citizens –

namely, at a minimum, the timely disclosure of the state's execution protocol,

including the injectable drugs it intends to use.

    Judicial review of Defendants' execution protocol *requires* disclosure.  By

withholding material information about the drugs they will use, Defendants

"ensure[] [themselves] a way of using a protocol that a court can 'never' look at it

---

[3] Rick Lyman, *Ohio Execution Using Untested Drug Cocktail Renews the Debate over Lethal Injections*, N.Y. TIMES, Jan. 17, 2014, at A15 (internal quotation marks omitted).

[4] Alan Johnson, *Inmate's Death Called 'Horrific' Under New, 2-Drug Execution*, The Columbus Dispatch, Jan. 17, 2014, *available at* http://www.dispatch.com/content/stories/local/2014/01/16/mcguire-execution.html

[5] Katie Freckland, *Clayton Lockett writhed and groaned.  After 43 minutes, he was declared dead*, The Guardian, April 30, 2014, *available at* http://www.theguardian.com/world/2014/apr/30/clayton-lockett-oklahoma-execution-witness

in any serious fashion, and [they] can 'flout' the requirement for a constitutionally

sufficient protocol 'without fear of repercussion.'" *Beaty v. Brewer*, 649 F.3d

1071, 1073 (9th Cir. 2011)(dissenting rom the denial of rehearing en banc)

(quoting *Dickens v. Brewer*, 631 F.3d 1139, 1146 (9th Cir. 2011)).  This is not

merely "impairment of ... litigating capacity," but a *de facto* foreclosure of any

opportunity to litigate Mr. Bucklew's claims on the merits.

Judicial review is essential to preventing an erroneous deprivation of Mr.

Bucklew's life interest in a humane execution.  Without judicial review, a state can

– just as Missouri *has* in Mr. Bucklew's case – change the drugs it plans to use to

execute a condemned inmate at the eleventh hour without notifying anyone.

Though the undisclosed drugs might subject Mr. Bucklew to a substantial risk of

unnecessary pain and suffering – because of adverse reactions with his current

medications, contaminants, or inappropriate pH levels – no court would have any

opportunity to review the execution method and find whether it violated the Eighth

Amendment.  As long as he remains in the dark, Mr. Bucklew cannot possibly

present the court with the heightened "specificity" of detail required by the district

court, including, for example, "discussion of the length of time Bucklew may

suffer pain," or exactly how the "drug interactions could cause pain."  (Doc. 17,

pp. 8, 9).  Bucklew can offer only speculation absent *actual knowledge* of what

substances his experts must consider.  Due process does not permit Defendants to

require the federal courts to "tak[e] [the state's] word that [Mr. Bucklew's] rights will not be violated." *Oken v. Sizer*, 321 F. Supp. 2d 658, 665 (D. Md. 2004). The court cannot require plaintiffs to disprove facts exclusively, willfully within the possession of Defendants.

With respect to the third *Mathews* factor, Defendants have no substantial countervailing interest in preventing courts from enforcing the Eighth Amendment by refusing to disclose the information about the lethal drug. The state cannot seriously assert that it has a significant interest in preventing adjudication of the protocol's lawfulness with regard to Mr. Bucklew, whose medical condition presents an unusually high likelihood of the execution being botched or failing entirely, with tragic consequences. Mr. Bucklew has proposed numerous assurances that will protect the anonymity of the execution team's members. Providing Mr. Bucklew the material information he requests about Defendants' lethal drugs imposes no "fiscal [or] administrative burdens" on the State of Missouri. *Mathews*, 424 U.S. at 335. Defendants' self-serving interest in protecting themselves from possible embarrassment, public scrutiny, or disclosure of actual unlawful behavior cannot be recognized by this Court as outweighing Mr. Bucklew's right to a humane execution. Nor does it serve the public, as the states' citizens have a formidable interest in seeing that Defendants impose sentences of death lawfully, humanely, and in conformity with the constitution.

*Defendants simply do not have a cognizable interest in carrying out a criminal judgment in violation of the Eighth Amendment.* Mr. Bucklew's due process claim presents no insurmountable obstacle to the state's constitutional enforcement of the judgment against him: if the disclosed information shows Mr. Bucklew can be executed consistent with the Constitution, the execution will go forward. There is no undue burden imposed by asking Defendants to disclose material information about the lethal drugs to facilitate judicial review at a "meaningful time and in a meaningful manner." *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004)(quoting *Fuentes*, 4007 U.S. at 80)(internal quotation mark omitted).

Because of Mr. Bucklew's "almost uniquely compelling" private interest, the serious risk of irreversible erroneous deprivation, and the minimal countervailing government interests, Mr. Bucklew is entitled to timely notice of material information about the drug that will be used in his execution.

## V. Conclusion

Based on the foregoing arguments, Mr. Bucklew respectfully requests that this Court grant his motion for a stay of execution, set the case for hearing on the merits with a briefing schedule followed by reversal and remand to the district court to allow the case to go forward for a full hearing.

Respectfully submitted,

/s/ Cheryl A. Pilate
Cheryl A. Pilate, Mo. No. 42266
Lindsay J. Runnels, Mo. No. 62075
MORGAN PILATE LLC
926 Cherry Street
Kansas City, MO  64106
Phone:  816-471-6694
Fax:   816-472-3516
Email:  cpilate@morganpilate.com
Email:  lrunnels@morganpilate.com

## CERTIFICATE OF SERVICE

I, Cheryl A. Pilate do hereby certify that a copy of the above and foregoing was

served on the Court and opposing counsel via the electronic filing system on this

20th day May, 2014.

/s/ Cheryl A. Pilate